## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Marianne Liptak, Trustee for the Next of Kin
of Theresa Rotter and Personal Representative
of the Estate of Theresa Rotter,

      Plaintiff,

  v.

Ramsey County, d/b/a Ramsey County Care
Center; Steven Fritzke, in his individual capacity
as Administrator of the Ramsey County Care Center;
Joleen Magee, in her individual capacity as the
Director of Nursing of the Ramsey County Care
Center; and John Doe, in his individual capacity as
an employee of the Ramsey County Care Center,

      Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 16-225 ADM/JSM

_____

Andrew D. Gross, Esq., Kosieradzki Smith Law Firm, Plymouth, MN, on behalf of Plaintiff.

Andrea Pavelka Hoversten, Esq., and Robert M. Mahoney, Esq., Geraghty, O'Loughlin &
Kenney, PA, Saint Paul, MN, on behalf of Defendants.

_____

## I. INTRODUCTION

On July 14, 2016, the undersigned United States District Judge heard oral argument on

Defendants' Motion to Dismiss [Docket No. 35] and Motion to Strike Materials Outside of the

Pleadings [Docket No. 50]. For the reasons set forth below, Defendants' Motion to Dismiss is

granted and the Motion to Strike Materials Outside of the Pleadings is denied as moot.[1]

---

[1] While these Motions were under advisement, Magistrate Judge Janie S. Mayeron issued
an Order [Docket No. 65] denying Liptak's Motion to Compel [Docket No. 22]. Liptak timely
filed an Objection [Docket No. 68]. Because this Order is dispositive of Liptak's federal claims,
Liptak's Objection is moot.

## II. BACKGROUND[2]

On April 1, 2013, Theresa Rotter ("Rotter"), an 88-year-old woman with dementia, developmental delays, and seizures, died as a result of choking on food served at the Ramsey County Care Center (the "RCCC").  Compl. [Docket No. 1] ¶¶ 5, 45, 86.  Plaintiff Marianne Liptak ("Liptak"), as trustee for the next-of-kin and the personal representative of the estate of Theresa Rotter, has filed suit against Ramsey County and RCCC employees seeking recovery under 42 U.S.C. § 1983 and the state law of negligence.  Id. ¶¶ 7, 8, 97–188.

### A.  RCCC, Rotter, and the March 31, 2013 Meal

On January 8, 2012, Rotter was admitted to RCCC, a 178-bed nursing home located in Maplewood, Minnesota.  Id. ¶¶ 10, 44.  One year later, on January 9, 2013, the RCCC nursing staff received physician's orders that Rotter's diet was being changed to a "National Dysphasis Diet 1" ("NDD1"), a diet consisting exclusively of pureed, homogenous, and cohesive foods that are "pudding like" without the coarse textures of raw fruits and vegetables, or nuts.  Id. ¶¶ 46, 47.  The change in Rotter's diet was to reduce the risk of choking, aspiration, and death.  Id. ¶ 48.  The new diet was recorded in Rotter's care plan on January 16, 2013.  Id. ¶¶ 48, 49.

March 31, 2013 was Easter Sunday.  On that day, eleven RCCC residents were served food that created high risks of injury, including choking.  Id. ¶ 52.  Rotter was one of the eleven; she was served a meal that included non-pureed ham, potato, and a roll—foods that were prohibited by her NDD1 diet.  Id. ¶ 55. Shortly after consuming a portion of her noon meal, Rotter choked, aspirated, and began vomiting.  Id. ¶ 59.  X-rays taken later that day revealed a

---

[2] In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).

pulmonary edema caused by aspiration of food.  Id. ¶ 62.  For the remainder of that Sunday and into the next morning, Rotter was vomiting, her extremities were cold to the touch, and she developed a fever.  Id. ¶¶ 63–68.

During the morning of April 1, 2013, Rotter became minimally responsive and her oxygen saturation levels began dropping.  Id. ¶¶ 69, 70.  RCCC contacted Liptak, who agreed that Rotter should be transferred to United Hospital.  Id. ¶ 71.  Despite hospital staff administering oxygen and placing Rotter on a continuous positive airway pressure machine, Rotter's oxygen saturation levels failed to return to normal and she was diagnosed with aspiration pneumonia with superimposed bacteria.  Id. ¶¶ 73, 74, 79, 81, 83.  At 5:55 that evening, April 1, 2013, Rotter died of aspiration pneumonia as a result of choking on food.  Id. ¶ 86.

**B.  Department of Health Investigation**

The Minnesota Department of Health (the "MDH") investigated the incident.  Id. ¶ 87, Ex. 3.  The MDH discovered that RCCC served the wrong food to Rotter and ten other patients on Easter Sunday, March 31, 2013.  Id. ¶ 88.  The MDH investigator found that Ramsey County understaffed its nursing facilities on weekends and holidays, that the food delivery system was not formally audited on the weekends, and on March 31, 2013, the technician who was typically responsible for ensuring that RCCC residents received the proper food was not working.  Id. ¶¶ 92–95.  The investigation substantiated a finding of neglect against RCCC and concluded that the facility as a whole was responsible for serving Rotter the incorrect meal.  Id. ¶ 89.

**C.  RCCC's Food Delivery System**

The RCCC utilizes a computer system to provide its residents with their physician-

ordered therapeutic diets.  Id. ¶¶ 34, 35.  The computer system generates printed instructions that inform the nursing and dietary staff of the type of food to be delivered to each resident.  Id. ¶ 35. A food technician then audits the delivery of food to each resident.  Id.  According to Liptak, prior to March 31, 2013, RCCC employees were aware that on holidays the food delivery system would generate instructions to serve all residents the same meal, regardless of their individual dietary needs.  Id. ¶ 37.

**D.  Claims**

Liptak asserts 13 causes of action.  Eight seek survival and wrongful death damages under 42 U.S.C. § 1983.  These federal claims arise under the Federal Nursing Home Reform Act, the Due Process Clause of the Fourteenth Amendment, and Monell v. Department of Social Services, 436 U.S. 658 (1978).  The remaining five causes of action are negligence theories that arise under state law.

### III.  DISCUSSION

**A.  Motion to Strike**

In opposing Defendants' Motion to Dismiss, Liptak submits the Declaration of Andrew D. Gross [Docket No. 49].  The Gross Declaration is comprised of RCCC Administrator Steven Fritzke's deposition transcript; RCCC's Minimum Data Sets for Rotter that were completed on April 12, 2012 and January 10, 2013; and interviews of RCCC employees conducted by the MDH.  Defendants argue that the exhibits to the Gross Declaration must not be considered at the Rule 12 dismissal stage because they are materials outside the pleadings.  Liptak responds that the exhibits to the Gross Declaration may be considered on this Motion because they are either materials that are part of the public record, materials that do not contradict the Complaint, or

materials that are necessarily embraced by the pleadings.

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the court generally must ignore materials outside the pleadings." Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999). Exceptions to the general rule are "materials that are part of the public record or do not contradict the complaint as well as materials that are necessarily embraced by the pleadings." Id. (quotations and citation omitted). The interpretation of the rule is "appropriate in light of our prior decisions indicating a 12(b)(6) motion will succeed or fail based upon the allegations contained in the face of the complaint." Gibb v. Scott, 958 F.2d 814, 816 (8th Cir. 1992) (quotation marks omitted). "[T]he court has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion." Stahl v. United States Dep't of Agric., 327 F.3d 697, 701 (8th Cir. 2003) (quotation omitted).

The Court agrees with Defendants that the exhibits to the Gross Declaration are materials outside of the pleadings that must not be considered at the Rule 12 stage. A full analysis of this issue, however, is not needed here because, as explained below, even if the materials attached to the Gross Declaration are considered, Liptak's federal claims do not meet the plausibility threshold required to survive a Rule 12 motion.

**B. Motion to Dismiss**

### 1. Legal Standard

Under Rule 8(a) of the Federal Rules of Civil Procedure, pleadings "shall contain a short and plain statement of the claim showing that the pleader is entitled to relief." A pleading must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 679.  "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'"  Id. (quoting Fed. R. Civ. P. 8(a)(2)).

### 2. Section 1983

"Section 1983 imposes liability for certain actions taken 'under color of' state law that deprive a person 'of a right secured by the Constitution and laws of the United States.'"  Dossett v. First State Bank, 399 F.3d 940, 947 (8th Cir. 2005), (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 931 (1982)).  Section 1983, however, "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).

Liptak contends that the Federal Nursing Home Reform Act, the Fourteenth Amendment of the United States Constitution, and RCCC's food delivery policies and customs are the federal rights that Liptak can vindicate through § 1983.

### a. Federal Nursing Home Reform Act

Liptak argues that RCCC violated Rotter's rights secured by the Federal Nursing Home Reform Act (the "FNHRA"), 42 U.S.C. § 1396r.  According to Liptak, when RCCC served

Rotter a non-pureed meal, it violated specific rights of nursing home residents guaranteed by the

FNHRA, such as the "right to receive services with reasonable accommodation of individual

needs and preferences;" "the right to receive a diet prepared in a form to meet the individual

needs of the residents;" and "the right to receive a diet that meets daily nutritional and special

dietary needs."  Compl. ¶ 106.  Defendants do not explicitly disagree that RCCC violated certain

FNHRA provisions.  Defendants do, however, contend that the FNHRA does not provide an

implied private right of action enforceable under § 1983 because the FNHRA does not confer

rights upon nursing home residents.  Defendants argue rather than bestowing rights upon nursing

home residents, the FNHRA directs what a nursing home facility must do in order to continue

receiving federal funding.  This, Defendants conclude, falls short of an unambiguously conferred

right needed to support an implied cause of action through § 1983.

### i.  Historical Background

The Medicaid Act, 41 U.S.C. § 1396, et seq., "is a cooperative federal-state program

through which the Federal Government provides financial assistance to States so that they may

furnish medical care to needy individuals."  Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 502

(1990).  State participation is not compulsory, but states electing to participate must comply with

certain requirements and regulations.  To be eligible for federal funding, states must submit a

comprehensive plan to the Secretary of Health and Human Services that provides "a scheme for

reimbursing health care providers for the medical services provided to needy individuals."  Id.

For nursing homes to receive reimbursement, they must be certified by complying with the

Medicaid Act's rules and regulations.  42 U.S.C. § 1396r(b)–(d).

In 1987, Congress enacted the FNHRA to provide enhanced oversight and inspection of

nursing homes participating in the Medicare and Medicaid programs.  Prior to the FNHRA, only

limited sanctions were available to apply to nursing homes that failed to comply with federal

participation requirements.  H.R.Rep. No. 100–391, at 471 (1987), reprinted in 1987

U.S.C.C.A.N. 2313–1, 2313–290.  The available sanctions were rarely invoked and, as a result,

substandard facilities continued to operate.  Id. at 471, reprinted in 1987 U.S.C.C.A.N. at

2313–291.  After the enactment of the FNHRA, civil penalties, resident transfers, and closure of

non-conforming facilities were among the new remedies available to the Secretary of Health and

Human Services and state governments to regulate nursing homes.  42 U.S.C. § 1395r(h).

The FNHRA establishes baseline health-related standards for participating nursing

facilities.  See generally 42 U.S.C. § 1396r(b).  Nursing facilities are also required to protect and

promote certain rights of their residents, including (1) the freedom to choose their attending

physician, (2) guarantees of privacy and confidentiality, (3) reasonable accommodations, (4)

participation in resident activities, and (5) any other right established by the Secretary of Health

and Human Services, found in 42 C.F.R. §§ 483.10 through 483.25.

### ii.  Implied Right of Action

The parties agree that the FNHRA does not provide an explicit private right of action.

Therefore, Liptak's FNHRA-based claims turn on whether there is an implied right of action,

enforceable by § 1983.  To be actionable through § 1983, there must be a violation of a federal

right, not merely the violation of a federal law.  Golden State Transit Corp. v. City of Los

Angeles, 493 U.S. 103, 106 (1989).  Three factors determine whether a particular statutory

provision gives rise to a federal right:

> First, Congress must have intended that the provision in question benefit the
> plaintiff.  Second, the plaintiff must demonstrate that the right assertedly

> protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence.  Third, the statute must unambiguously impose a binding obligation on the States.  In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

Blessing v. Freestone, 520 U.S. 329, 340–41 (1997) (citations and quotation marks omitted).

Regarding the first factor, "[a]nything short of an unambiguously conferred right" is insufficient to support a cause of action brought under § 1983.  Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002).

Liptak's FNHRA claims must satisfy the first Blessing factor:  intent of the provisions in question to benefit the plaintiff.  This question has been considered by courts across the country, with the majority concluding that the FNHRA is not a source of substantive federal rights that can be enforced through § 1983.  See Anderson v. Dooley, No. 15-5120, 2016 WL 3162167, at *4 (N.D. Cal. June 7, 2016) ("the sizeable majority of courts . . . have found that the FNHRA does not confer private federal rights").  However, a significant minority of courts, both district and circuit, have held that a plaintiff can sue by way of § 1983 for alleged FNHRA violations.  In 2001, for example, the Second Circuit considered whether the FNHRA conferred a private right of action for health care providers.  Concourse Rehabilitation & Nursing Ctr. Inc. v. Whalen, 249 F.3d 136 (2d Cir. 2001).  In holding that the FNHRA was not intended to benefit health care providers, the Second Circuit stated, "[r]ather, the provision is obviously intended to benefit Medicaid beneficiaries."  Id. at 144.  Some district courts in the Second Circuit have relied upon that comment as the basis for their conclusions that certain FNHRA provisions confer rights for nursing home residents that are actionable by way of § 1983.  See Joseph S. v. Hogan, 561 F. Supp. 2d 280, 298–99 (E.D.N.Y. 2008) (finding that FNHRA's Preadmission Screening and Resident Review provisions conferred individual rights on nursing home residents); Pantalone ex

9

rel. Pantalone v. Cty. of Fulton, No. 10-913, 2011 WL 1457935, at *3–4 (N.D.N.Y. April 15, 2011) (citing Concourse Rehabilitation for the proposition that the plaintiff, as a Medicaid recipient, is an intended beneficiary of the FNHRA).

Even within the Second Circuit, however, courts have reached the opposite conclusion, holding that the FNHRA does not have "rights creating" language that can be enforced through § 1983. For example, in Baum v. Northern Dutchess Hospital, 764 F. Supp. 2d 410, 422 n.13 (N.D.N.Y. 2011), the district court rejected the laconic quoted statement in Concourse, noting that "[c]onspicuously absent from Concourse is a finding that § 1396r unambiguously grants a personal federal cause of action to nursing home residents against either the state or a state actor and thus has dubious prudential value." Baum relied chiefly upon Prince v. Dicker, 29 F. App'x 52, 54 (2d Cir. 2002) and the case that Prince drew heavily upon, Brogdon ex rel. Cline v. National Healthcare Corp., 103 F. Supp. 2d 1322, 1330–32 (N.D. Ga. 2000), to support its conclusion that "the Nursing Home Reform Act's provisions do not confer a right of action on [the plaintiff] that can be enforced against a private nursing home." Baum, 764 F. Supp. 2d at 423.

The Third Circuit has also ruled on this question, holding, like Concourse, that the FNHRA satisfies the first Blessing factor. Grammer v. John J. Kane Reg'l Ctrs.–Glen Hazel, 570 F.3d 520, 527–28 (3d. Cir. 2009). In reasoning that the FNHRA was sufficiently "rights-creating" to satisfy Gonzaga's stricter mandate of the first Blessing factor, the Grammer majority concluded that "[t]he various provisions of the FNHRA at issue here place an unmistakable focus on the benefitted class—Medicaid recipients who are residents of Medicaid participating nursing homes." Id. at 530 (quotation marks omitted).

As with <u>Concourse</u>, <u>Grammer</u> has been met with criticism, with courts characterizing its holding as being "inconsistent with the Supreme Court's admonition in <u>Gonzaga</u> that statutes only display congressional intent to create federal rights when their text has 'an unmistakable focus on the benefitted class.'" <u>Duncan v. Johnson-Mathers Health Care, Inc.</u>, No. 9-417, 2010 WL 3000718, at *8 (E.D. Ky. July 28, 2010) (quoting <u>Gonzaga</u>, 536 U.S. at 283)); <u>see also</u> <u>Roberts v. Woodcrest Manor Care Ctr.</u>, No. 12-200, 2012 WL 6652502, at *4 (E.D. Ky. Dec. 20, 2012).  In the Eighth Circuit, one court concluded "[t]he majority of courts to consider whether FNHRA provides an implied private right of action have determined it does not." <u>James v. Bd. of Curators of the Univ. of Mo.</u>, No. 9-2066, 2011 WL 147910, at *4 (E.D. Mo. Jan. 18, 2011).

The Court sides with the majority in concluding that the FNHRA does not provide a private right of action enforceable by § 1983.  First, the FNHRA is not written in clear language to "unambiguously" confer rights to nursing home residents. <u>Gonzaga</u>, 536 U.S. at 283.  The FNHRA is entitled "Requirements for nursing facilities" and its subsections chiefly specify what nursing homes must do to receive federal funding.  For example, § 1396r(c)(1)(A)(v)(I), a section cited in the Complaint, provides a nursing home resident the right "to reside and receive services with reasonable accommodation of individual needs and preferences."  That right, however, falls under the umbrella of § 1396r(c)(1)(A), which states that "[a] nursing facility must protect and promote the rights of each resident, including each of the following rights."  Similarly, § 1396r(b)(4)(A)(iv), another section cited by Liptak, obligates a nursing facility to provide "dietary services that assure that the meals meet the daily nutritional and special dietary needs of each resident."  As these sections demonstrate, rather than conferring rights on residents of nursing facilities, the FNHRA provisions cited by Liptak are worded to reflect what

requirements the nursing facility must meet in order to remain compliant.  As the dissent in

Grammer explained,

> Importantly, in each of the provisions in subsections (b) through (d), namely
> subsections (b)(1)–(8) and (d)(1)–(4), Congress began by stating:  "The nursing
> facility must . . ."  In each case, the focus is on what the nursing home facility
> must do in return for federal funds; the focus is not on the individuals to whom
> the benefits of each provision flows.

Grammer, 570 F.3d at 533 (Stafford, J., dissenting) (emphasis in original).  That reasoning is

persuasive.

The FNHRA's implementing regulations also do not unambiguously confer rights on

nursing home residents.  The scope of those regulations state that these are "the requirements

that an institution must meet in order to qualify to participate as a [skilled nursing facility] in the

Medicare program, and as a nursing facility in the Medicaid program."  42 C.F.R. § 483.1.

Section 483.35, also cited in the Complaint, obligates nursing facilities to "provide each

resident with a nourishing, palatable, well-balanced diet that meets the daily nutritional and

special dietary needs of each resident."  Id. § 483.35.  Rather than focus on what nursing home

residents are guaranteed, the subsections explain what the nursing facility must do to meet that

broad mandate, such as "[t]he facility must employ sufficient support personnel," and "[e]ach

resident receives and the facility provides . . . [f]ood prepared in a form designed to meet

individual needs."  Id. §§ 483.35(b); 483.35(d)(3).  As before, the thrust of the implementing

regulations is directed to the nursing home, not its residents.

Additionally, the FNHRA is Spending Clause legislation.  Grammar, 570 F.3d at 532

(Stafford, J., dissenting).  Legislation passed under Congress' Spending Clause power rarely

creates implied private enforcement rights.  See Pennhurst State Sch. & Hosp. v. Halderman, 451

U.S. 1, 28 (1981) ("In legislation enacted pursuant to the Spending power, the typical remedy for

state noncompliance with federally imposed conditions is not a private cause of action for

noncompliance but rather action by the Federal Government to terminate funds to the State.");

Gonzaga, 536 U.S. at 274 ("The Court's more recent decisions . . . have rejected attempts to infer

enforceable rights from Spending Clause statutes whose language did not unambiguously confer

such a right upon the Act's beneficiaries.").  As stated by the Eighth Circuit in Lankford v.

Sherman, 451 F.3d 496, 508 (8th Cir. 2006), "[f]or legislation enacted pursuant to Congress's

spending power, like the Medicaid Act, a state's non-compliance typically does not create a

private right of action for individual plaintiffs, but rather an action by the federal government to

terminate federal matching funds."  The wording of the statute combined with the motivation for

its passage leads to the conclusion that the FNHRA is similar to other Spending Clause

legislation where an implied private right of action for individual plaintiffs was not intended.

Gonzaga requires the statutory language to be "phrased in terms of the persons

benefitted," not the persons regulated.  536 U.S. at 284.  The FNHRA is phrased in terms of the

regulated class, not the benefitted class.  There is a stark difference between the statutory

language that Gonzaga found did confer a private right of action—"[n]o person . . . shall . . . be

subjected to discrimination"—and the FNHRA provisions cited in the Complaint—"[a] nursing

facility must. . . ."  Id.; 42 U.S.C. § 1396r(b)(1)(A).  For these reasons, Liptak's § 1983 claims

based on violations of the FNHRA are dismissed.

### b.  Fourteenth Amendment

Alternatively to her FNHRA theories, Liptak argues that she can pursue a § 1983 claim

through the Fourteenth Amendment's Due Process Clause for the deprivation of Rotter's serious

medical needs.  The Court disagrees.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend XIV, § 1.  While courts recognize that the Due Process Clause protects against the State's own violation of individual constitutional rights, the clause is "not a guarantee of certain minimal levels of safety and security" and does not impose an affirmative duty on municipal entities to protect citizens from harm that may "come . . . through other means."  DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 195 (1989).  Indeed, the Due Process Clause does not "transform every tort committed by a state actor into a constitutional violation."  Id. at 202.

Nevertheless, the Eighth Circuit has recognized two situations where the Due Process Clause imposes a duty on state actors to protect and care for its citizens.  Carlton v. Cleburne Cty., Ark., 93 F.3d 505, 508 (8th Cir. 1996).  The first is "in custodial and other settings in which the state has limited the individuals' ability to care for themselves; and second, when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced."  Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992).

### i.  Custodial Setting

Liptak is unable to pursue a Due Process claim under the first theory because Rotter was not in a detention or custodial setting.  In every case cited by Liptak, each of the aggrieved individuals were either prisoners, pretrial detainees, or otherwise in state custody.  See, e.g., Vaughn v. Green Cty., Ark., 438 F.3d 845, 850–51 (8th Cir. 2006) (pretrial detainee); Jackson v. Buckman, 756 F.3d 1060, 1065 (8th Cir. 2014) (same); Scott v. Benson, 742 F.3d 335, 339 (8th Cir. 2014) (civilly committed individual); Hall v. Ramsey Cty., 801 F.3d 912, 917 (8th Cir.

14

2015) (involuntary committed).

Although Rotter was living in and receiving treatment at RCCC, a state facility, the Complaint does not aver that she was held there against her own volition or that the state limited Rotter's ability to care for herself.  Rather, the Complaint alleges that it was Rotter's medical needs, and not state action, that was the cause for her admission and residence at RCCC.  See Compl. ¶ 45 ("Rotter required nursing home care, in part, because of her mental diagnoses").  Without the state exercising confining authority, Liptak is unable to pursue a Fourteenth Amendment Due Process claim under a generalized right to medical care.

### ii.  State-Created Danger

Under substantive due process, a state is required to protect an individual if it created the danger to which the individual is subjected.  Hart v. City of Little Rock, 432 F.3d 801, 805 (8th Cir. 2005).  Sustaining a due process violation under the state-created theory requires Liptak to prove that:  1) Rotter was a member "of a limited, precisely definable group;" 2) RCCC's conduct put Rotter "at significant risk of serious, immediate, and proximate harm;" 3) the risk was "obvious or known" to RCCC; 4) RCCC "acted recklessly in conscious disregard of the risk;" and 5) "in total [RCCC's] conduct shocks the conscience."  Id.  "To shock the conscience, . . . an official's action must either be motivated by an intent to harm, or, where deliberation is practical, demonstrate deliberate indifference."  Montgomery v. City of Ames, 749 F.3d 689, 695 (8th Cir. 2014).  Acts that are merely negligent or even grossly negligent are not conscience shocking.  S.S. v. McMullen, 225 F.3d 960, 964 (8th Cir. 2000).

Assuming without deciding that the lower, deliberate indifference standard applies, the Complaint does not allege a plausible substantive due process claim under the state-created

danger theory.  "Deliberate indifference requires both that the official 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and that the official actually drew that inference."  <u>Montgomery</u>, 749 F.3d at 695 (quoting <u>Hart</u>, 432 F.3d at 806).  The allegations here stand in stark contrast to those in other cases where the standard was satisfied.  For example, in <u>Penilla v. City of Huntington Park</u>, 115 F.3d 707, 708 (9th Cir. 1997), a case cited by Liptak, an individual became seriously ill and his neighbors called 911 for emergency medical services.  The first officers to respond examined the individual and determined that he was in grave need of medical care.  <u>Id.</u>  The officers next cancelled the request for paramedics, broke the lock and door jam on the front door of the individual's house, moved the individual inside the house, and left.  <u>Id.</u>  The individual was found dead inside the house the following day.  <u>Id.</u>

In <u>Estate of Massey v. City of Philadelphia</u>, 118 F. Supp. 3d 679 (E.D. Penn. 2015), another case cited by Liptak, where a Fourteenth Amendment Due Process claim survived a Rule 12 motion, a school followed a policy that students could not possess or use prescribed medicine without nurse supervision.  <u>Id.</u> at 685.  A sixth grade asthmatic student started suffering from an asthma attack on a day when no nurse was present at school.  <u>Id.</u>  Although the student's condition gradually worsened, the school did not seek medical help and the student was later driven home.  <u>Id.</u>  Immediately upon arriving home, the student was driven to the hospital where, en route, she suffered respiratory arrest and died.  <u>Id.</u>  In both <u>Penilla</u> and <u>Massey</u>, the conduct of the state actor was so egregious that it satisfied the deliberate indifference standard required to state a Due Process claim under a state-created danger theory.

As these two cases illustrate, conscience shocking, deliberately indifferent behavior is

reserved for acts more deliberately egregious than those alleged here.[3]  In contrast, the

Complaint depicts a computer and administrative error that went unnoticed and uncorrected.  As

the MDH investigation concluded:

> [a]lthough the [RCCC] had policies and procedures in place to ensure that
> residents were not given the incorrect food texture, staff did not follow the policy.
> The tray tickets did not have the consistency listed for each food item served
> which resulted in the resident receiving a regular diet texture instead of a pureed
> diet texture.

Compl. Ex. 3 at 3.  While the events on March 31, 2013 proved tragic and were frustratingly

preventable, the allegations in the Complaint do not allege facts that shock the conscience.

Liptak has not alleged a plausible Substantive Due Process claim under a deliberate indifference

standard.[4]

### 3.  <u>Monell</u>

Liptak next asserts claims against Ramsey County under <u>Monell v. Department of Social

Services</u>, 436 U.S. 658, (1978).  Liptak contends that RCCC's official policy caused a violation

of Rotter's constitutional rights, and that RCCC failed to adequately train its employees on its

food delivery system.  RCCC responds that Liptak's official policy theory fails because the food

delivery system itself did not deprive Rotter of her constitutional rights.  RCCC also argues that

---

[3] Liptak cites a passage from RCCC Administrator Steven Fritzke's deposition to
establish that RCCC employees acted with deliberate indifference.  The cited passage is Fritzke's
lay opinion on whether RCCC employees' actions could be characterized as deliberately
indifferent.  Fritzke's deposition answer is immaterial to the Court's analysis of this question at
this Rule 12 stage of litigation.

[4] In her brief, Liptak asserts independent of the state-created danger theory that
Defendants' actions shock the conscience.  The conscience shocking standard, however, applies
the state-created danger exception to the general rule that the Due Process Clause does "not
provide a cause of action for a State's failure to protect an individual against private violence."
<u>Montgomery</u>, 749 F.3d at 694.

Liptak's allegations fail to show a pattern of persistent and widespread unconstitutional practices necessary to support a Monell claim under a failure to train theory.

In Monell, the Supreme Court permitted a § 1983 claim against a municipality for injuries caused either by "an official municipal policy" or misconduct so pervasive among non-policymaking employees that it constitutes "a custom or usage." Id. at 691. "Official policy involves a deliberate choice to follow a course of action made from among various alternatives by an official who has the final authority to establish governmental policy." Jane Doe A v. Special Sch. Dist., 910 F.2d 642, 646 (8th Cir. 1990). Custom or usage is demonstrated by:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> (3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation.

Id.

The Supreme Court has clearly established that liability attaches only if the municipality itself was the "moving force" behind the alleged injury. Bd.of Cty. Com'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 400 (1997) (quoting Monell, 436 U.S. at 649). Also consistent in Supreme Court precedent is that municipality liability under a failure to train theory requires a "stringent standard of fault" that acts as a barrier against municipality liability collapsing into respondeat superior. Connick v. Thompson, 563 U.S. 51, 69 (2011).

The Complaint avers that RCCC utilized a computer system to assist licensed and unlicensed employees to deliver appropriate meals to each resident. The Complaint further avers

that RCCC administrators were aware that the computer system did not function properly on holidays and no action was taken to remedy this known problem. It is also alleged that on March 31, 2013, a holiday and the day Rotter was served a meal that conflicted with her physician-ordered therapeutic diet, RCCC chose to not have a qualified individual on staff to audit the delivery of food. Finally, the Complaint alleges that despite this knowledge, RCCC and its administrators chose not to adequately train its staff on how to comply with physician-ordered therapeutic diets.

In Monell, the city's policy itself was unconstitutional. Szabla v. City of Brooklyn Park, Minn., 486 F.3d 385, 389 (8th Cir. 2007). That is not the case here; the deprivation of Rotter's rights was not caused by any official RCCC policy. The food delivery system, if viewed as an official policy for Monell purposes, depicts a system designed to ensure residents receive proper meals. Even when incorrect tickets were printed and a food auditor is removed from the system, Rotter's rights were not violated by the food delivery policy.[5]

Accordingly, the food delivery system itself "is lawful on its face and does not compel unconstitutional action by an employee of the municipality." Id. at 390. This, however, does not end the inquiry, because "[w]here a policy is constitutional on its face, but it is asserted that a municipality should have done more to prevent constitutional violations by its employees, a plaintiff must establish the existence of a 'policy' by demonstrating that the inadequacies were a product of deliberate or conscious choice by policymakers." Id. (citing City of Canton, Ohio v.

_____

[5] Importantly, the Complaint avers that on March 31, 2013, Fritzke and Magee "chose not [to] have a food technician or a similarly qualified individual on duty to audit the delivery of food." Compl. ¶ 41. Contrary to Liptak's current contention, this signals Fritzke and Magee elected not to have an auditor on staff that day, rather than that staffing decision being part of RCCC's food delivery policy.

Harris, 489 U.S. 378, 389 (1989)).  The Eighth Circuit has identified three elements for claims alleging a municipality's failure to train its employees:

> 1) that the government entity's training practices were inadequate; 2) that the government entity was deliberately indifferent to the rights of others in adopting the training practices, such that their failure reflects a deliberate or conscious choice by the government entity; and 3) that the alleged deficiencies in the training practices caused the plaintiff's injury.

D.B. v. Hargett, No. 13-2781, 2014 WL 1371200, at *7 (D. Minn. April 8, 2014) (citing B.A.B. v. Bd. of Educ. of St. Louis, 698 F.3d 1037, 1040 (8th Cir. 2012)).  "Plaintiffs must prove that 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [RCCC] can reasonably be said to have been deliberately indifferent to the need.'"  B.A.B., 698 F.3d at 1040 (quoting Canton, 489 U.S. at 998).

The Complaint does not plausibly plead either element one or two, both of which are needed to sustain a viable Monell failure to train cause of action.  Regarding the first element, Liptak has not plead any facts showing that RCCC's training practices were inadequate.  Indeed, the only averment in the Complaint concerning RCCC's training methods or practices is paragraph 43, which states, "Ramsey County, Steven Fritzke and Joleen Magee chose not to adequately train its staff to comply with physician-ordered therapeutic diets."[6]  Compl. ¶ 43.  As

---

[6] Liptak also cites interviews conducted by the MDH during its investigation to support her failure to train theory.  See Gross Decl. Ex. 4.  The interviews were part of the MDH's investigation and are of RCCC employees who generally opined that they could have benefitted from more training.  These individualized opinions are of dubious evidentiary value in determining whether Liptak has stated a plausible Monell claim under a failure to train theory because they are mere opinion of non-policymakers.  Critically, the interviews are silent regarding the amount of training RCCC employees received on food delivery.  As noted above, without any factual support as to the baseline level of training RCCC employees received, Liptak's claim based on inadequate training is speculative and does not satisfy the plausibility

other courts have noted, unless the pleading identifies the municipality's existing training policies and procedures, it cannot be said that its employees were inadequately trained. Hargett, 2014 WL 1371200, at *7. Employees can always receive more training. But there is an identifiable point where that training becomes sufficient and municipality liability for failure to train necessarily fails. Without any facts alleging how the municipality trained its employees, the pleading is deficient because it does not provide a baseline from which to assess the alleged deficiency. Merely pleading that the employees' training was inadequate or insufficient is a legal conclusion that does not plausibly plead a cause of action. See Iqbal, 556 U.S. at 678 ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").

Even if Liptak had satisfied the first element, which she has not, her failure to train theory is also deficient because it is missing the second requirement: notice. On this point, Connick is instructive. The plaintiff in Connick was tried and convicted of attempted armed robbery and murder, and was sentenced to death. 563 U.S. at 54. One month before the execution date, the plaintiff's investigator discovered exculpatory evidence from the armed robbery trial that was not turned over to the defense, in violation of Brady v. Maryland, 373 U.S. 83 (1963). Id. After a reviewing court determined that the evidence was exculpatory and plaintiff's convictions were vacated, the plaintiff sued the district attorney, the district attorney's office, and others under § 1983, alleging that the Brady violation was caused by the district attorney's "deliberate indifference to an obvious need to train the prosecutors in his office in order to avoid such constitutional violations." Id. at 57. In holding that the plaintiff's failure to

threshold required to survive a Rule 12 motion.

train theory failed to meet the strict standard of proof, the Supreme Court first noted that a municipality may be deemed deliberately indifferent if the policymakers were on actual or constructive notice that a particular omission in their training program causes violations of citizens' constitutional rights.  Id. at 61.  To demonstrate deliberate indifference, the Supreme Court stated, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary.'"  Id. at 62.  "Without notice that a course of training is deficient in a particular respect, decision-makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  Id.

The Complaint does not allege a pattern or history of similar violations incurred by failures in RCCC's food delivery system.  Although the Complaint does reference previous FNHRA violations by RCCC, none of the identified violations concern serving meals that conflict with a patient's physician-ordered therapeutic diet.  Nor do the allegations in this case fit inside the narrow "single-incident" exception first noted in Canton and analyzed in Connick. Connick characterized the single-incident exception as the Supreme Court's desire "not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."  563 U.S. at 64.

Even when assuming all allegations as true, the Complaint distills to RCCC failing to correct a known issue with meal tickets being incorrectly printed on holidays.  Absent from the Complaint are any facts showing that this known issue caused violations of residents'

constitutional rights prior to Rotter being delivered an inappropriate meal.[7]  Statements from

RCCC employees claiming that they felt inadequately trained do not demonstrate that RCCC

disregarded a known consequence of failing to properly train its employees.  Critically, the MDH

investigation did not identify any prior incidents that were caused by errors in RCCC's food

delivery system.  Rather than showing a history of failure, the MDH investigation supports the

determination that what happened on March 31, 2013 was "an isolated incident of alleged . . .

misconduct" that generally cannot "establish a municipal policy or custom creating liability

under § 1983."  Ulrich v. Pope Cty., 715 F.3d 1054, 1061 (8th Cir. 2013).  Accordingly, Liptak's

Monell claims are dismissed.

### 4. State Law Claims

This Order granting dismissal of Liptak's federal claims leaves remaining only state law

based causes of action.  As such, this Court must decide whether or not to exercise supplemental

jurisdiction over those claims.

28 U.S.C. § 1367(c)(3) provides that a district court may decline to exercise supplemental

jurisdiction over a claim if:  "The district court has dismissed all claims over which it has

original jurisdiction, . . . ."  A district court has the discretion to exercise or to refuse to exercise

pendant jurisdiction.  Marshall v. Green Giant Co., 942 F.2d 539, 549 (8th Cir. 1991) (citation

omitted).  Courts should "exercise judicial restraint and avoid state law issues whenever

possible."  Condor Corp. v. City of St. Paul, 912 F.2d 215, 220 (8th Cir. 1990).

---

[7] The Complaint avers, and the MDH investigation identified, ten other RCCC residents that also received an incorrect meal on March 31, 2013.  These contemporary instances of additional food delivery problems cannot for the predicate history required to support Liptak's failure to train theory because RCCC cannot be said to be on notice that its food delivery protocol violated residents' constitutional rights.

When deciding whether or not to exercise pendant jurisdiction, district courts are directed to consider:  "[T]he stage at which the federal claims were disposed of, the difficulty of the state claim, the amount of judicial time and energy already invested in it, the amount of additional time and energy necessary for its resolution, and the availability of a state forum."  Marshall, 942 F.2d at 549 (quotation marks omitted).

It is relatively early in the litigation process and the state claims are negligence based claims that are routinely and effectively handled in state court.  After reviewing all of the above factors, the Court declines to exercise supplemental jurisdiction.  Consequently, Liptak's remaining claims will be dismissed without prejudice, so that they may be considered in an appropriate state forum.

**IV.  CONCLUSION**

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendants' Motion to Dismiss [Docket No. 35] is **GRANTED as follows:**

      a.      Liptak's federal claims (Counts I–VIII) are **DISMISSED WITH PREJUDICE**;

      b.      Liptak's state law claims (Counts IX–XIII) are **DISMISSED WITHOUT PREJUDICE.**

2.      Defendants' Motion to Strike Materials Outside of the Pleadings [Docket No. 50] is **DENIED AS MOOT.**

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  September 23, 2016.